1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                          NORTHERN DISTRICT OF CALIFORNIA

7

8    JUDI PETERSON,                                No. C-10-03097 JCS

9              Plaintiff,                          **FINDINGS OF FACT AND
                                                   CONCLUSIONS OF LAW**
10       v.

11   AT&T UMBRELLA BENEFIT PLAN NO. 1,

12             Defendant.
     _____/
13

14   **I.    INTRODUCTION**

15         On November 18, 2011, the Court conducted a nonjury trial in the above matter.  Pursuant to

16   Federal Rule of Civil Procedure 52(a), the Court hereby makes the following findings of fact and

17   conclusions of law.[1]

18   **II.   PROCEDURAL BACKGROUND**

19         Plaintiff Judi Peterson brings this action for disability benefits under 29 U.S.C.

20   § 1132(a)(1)(B), which provides for civil actions against employee benefit plans governed by the

21   Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*  Plaintiff

22   alleges that long-term disability benefits to which she was entitled under the terms of the employee

23   benefit plan offered by her employer, AT&T Umbrella Benefit Plan No 1 ("the Plan"), were

24   wrongfully terminated.

25         The Court permitted limited discovery in the action on the question of the relationship

26   between the Plan and its claim administrator.  In particular, on January 31, 2010, and again on April

27   _____

28         [1]The parties waived the right to present live testimony and agreed that evidence would be
     presented by declaration.

*United States District Court*

*For the Northern District of California*

United States District Court

For the Northern District of California

29, 2011, the Court ordered Defendant to produce documents relating to the relationship between the Plan and the claim administrator, as well as the claim file. Defendant represented to the Court that it had complied with the Court's discovery order in a status report filed April 22, 2011. On the basis of Defendant's representation, the Court found that no further discovery was required.

In the trial briefs, the parties identified the following issues to be decided at trial: 1) whether the court should review Plaintiff's claim under the *de novo* standard of review or for an abuse of discretion; 2) whether the Plan's termination of benefits was supported by the record, under the applicable standard of review; and 3) whether Plaintiff established that she was entitled to long term disability benefits.

## III.   EVIDENTIARY RULINGS

### A.   Plaintiff's Objection to and Motion to Strike Declarations of Nikki Chreisman and Susan Hagestad and Documents Labeled AR 1067 to AR 1301

In her Objection to and Motion to Strike Declarations of Nikki Chreisman and Susan Hagestad and Documents Labeled AR 1067 to AR 1301 ("Plaintiff's Motion to Strike"), Plaintiff objects to and moves to strike: 1) the Declaration of Nikki Chreisman in Support of Defendant AT&T Umbrella Benefit Plan No. 1's Trial Brief ("Chreisman Decl."), in its entirety, or at least Exhibit B thereto; 2) the Declaration of Susan Hagestad in Support of Defendant AT & T Umbrella Benefit Plan No. 1's Trial Brief ("Hagestad Decl."); and 3) the documents lodged with the Court labeled AR 1067-AR 1301.

#### 1.   Contentions of the Parties

##### a.   Chreisman and Hagestad Declarations

Plaintiff contends that the declarations of Nikki Chreisman and Susan Hagestad should be stricken because Defendant failed to disclose these individuals and the information contained in their declarations prior to trial, in violation of the requirements of Rule 26 of the Federal Rules of Civil Procedure, thereby precluding Plaintiff from taking their depositions and conducting related discovery. Plaintiff asserts that she has been prejudiced by Defendant's failure to disclose these witness in at least two respects. First, both declarants state in their declarations that Sedgewick, the third-party claims administrator, receives a "flat fee for its services" regardless whether a claim is

1    approved or denied. *See* Chreisman Decl., ¶ 7;  Hagestad Decl., ¶ 9.  Plaintiff asserts that these

2    statements "apparently conflict" with the Administrative Services Agreement ("ASA") between

3    AT&T and Sedgewick that was produced by Defendant under the Court's January 31, 2011

4    discovery order, which reflects that Sedgewick's payment for processing claims is reduced where

5    certain performance criteria, including the accuracy of its claim denials, are not met.  As the

6    relationship between AT&T and its claims administrator are critical to the question of what standard

7    of review applies to the termination of Plaintiff's benefits, Plaintiff contends, reliance on these

8    previously undisclosed witnesses is unfair to Plaintiff.

9         Second, Plaintiff asserts that she should have had the opportunity to conduct discovery

10   related to a statement by Hagestad in her declaration that she routinely interprets and clarifies JURIS

11   Note entries, because such note entries are part of the administrative record in this case and may

12   have been altered in Defendant's favor by Hagestad.  Therefore, Plaintiff argues, Defendant should

13   be precluded from relying on these declarations at trial under Rule 37(c)(1) of the Federal Rules of

14   Civil Procedure.

15        In addition, Plaintiff argues that the Court should strike portions of Chreisman's and

16   Hagestad's declarations describing how Plaintiff's claim was handled on the basis that neither

17   individual was involved in the initial handling of Plaintiff's claim and thus, these statements do not

18   comply with Rule 602 of the Federal Rules of Evidence, requiring that testimony be based on

19   personal knowledge.[2]

20        Defendant counters that the declarations are offered merely to "assist the Court in

21   determining the proper standard of review and by summarizing and contextualizing what is already

22   undisputed in the administrative record."  These declarations are admissible, Defendant asserts,

23   because courts may consider evidence outside of the record in ERISA cases to determine whether

24   there is a conflict of interest under *Abatie v. Alta Health and Life Ins. Co.*, 458 F.3d 955, 970 (9th

25   Cir. 2006).  Further, Defendant argues, the declarations should be admitted into evidence because

26

27        [2]Specifically, Plaintiff objects on this basis to paragraphs 12 through 36 of the Hagestad
     Declaration (many of which authenticate documents relating to the processing of Plaintiff's claim) and
28   paragraphs 3 and 15 through 18 of the Chreisman Declaration.

1   both declarants have personal knowledge of the contents of the declarations and Hagestad is familiar

2   with the record-keeping of Sedgwick, making her an appropriate witness to authenticate documents

3   maintained by Sedgewick.

4          Defendant argues that preclusion of the declarations based on its failure to disclose these

5   witnesses in discovery is inappropriate for the additional reason that Rule 26 does not apply to

6   ERISA cases.  In any event, Defendant asserts, the declarations should not be excluded because

7   Plaintiff has not been prejudiced by Defendant's failure to disclose them earlier.  In particular,

8   Defendant rejects Plaintiff's contention that the statements about Sedgewick receiving a "flat

9   payment" are inconsistent with the ASA produced by Defendants, arguing that any reductions

10  resulting from failure to meet the accuracy criteria are based on overall statistics regarding claim

11  denials and do not change the fact that Sedgwick is paid a flat fee for processing any particular

12  claim, regardless of whether it is granted or denied.  Defendant also rejects Plaintiff's suggestion

13  that Hagestad may have altered the administrative record and submits a supplemental declaration in

14  support of its Opposition brief by Susan Hagestad stating that she merely "interpret and clarif[ies]

15  the short-hand codes that are contained within the JURIS notes, such as 'tpc' which means

16  'telephone call.'" Declaration of Susan Hagestad in Support of Defendant AT& T Umbrella Benefit

17  Plan No. 1's Opposition to Plaintiff's Motion to Strike ("Hagestad MTS Decl."), ¶ 4.  Hagestad

18  states further that JURIS notes cannot be altered after the close of business on the day they were

19  entered because they are stored in a database with date and time recorded.  *Id.*

20         In her Reply, Plaintiff argues that to the extent that the Chreisman and Hagestad Declarations

21  are offered to "summarize and contextualize" the administrative record, as Defendant contends,

22  rather than to address the existence of a conflict of interest, these declarations are not admissible

23  under *Abatie*, which permits discovery in ERISA cases involving review of an administrative record

24  *only* on the question of whether there is a conflict of interest that warrants application of the de novo

25  standard of review.  Plaintiff further asserts that Defendant should not be allowed to "plug the holes"

26  in Hagestad's original declaration and therefore, that the Court should not consider the Hagestad

27  MTS Declaration.

28

4

**United States District Court**
For the Northern District of California

**b.    Exhibit B**

Plaintiff asks the Court to strike Exhibit B to the Chreisman Declaration, even if it finds the declaration is otherwise admissible, on the basis that this document was not included in the administrative record that was produced by Defendant earlier in the litigation and was only revealed when Defendant submitted an expanded administrative record with its pre-trial materials in late September 2011.   Exhibit B is entitled "Summary Plan Description:  AT&T Disability Income Plan" and states that it is "the official document of the AT&T Disability Income Program."  It carries Bates numbers AR 1238 - AR 1301.  Plaintiff asserts that she was prejudiced by Defendant's failure to produce this plan document because this is the sole document offered by Defendant to establish that the abuse of discretion rather than the de novo standard applies to the Court's review of Plaintiff's claim.  Plaintiff asserts that she formulated her trial position and her settlement position based on the documents that Defendant *did* produce, which included a plan summary that contained significantly different language than the document offered in Exhibit B, including language indicating that it was *not* an official plan document.[3]

Defendant concedes that it inadvertently failed to include this document in the administrative record originally produced to Plaintiff and did not correct this omission until September 23, 2011, when it lodged an expanded administrative record with the Court in preparation for trial.  Opposition to Plaintiff's Motion to Strike at 4 n. 1.  Defendant contends, however, that Plaintiff has been aware throughout the litigation that her claims were governed by this document and is simply seeking to capitalize on Defendant's error.  *See* Defendant's Opposition to Plaintiff's Opening trial Brief at 1 (accusing Plaintiff of  "artfully" drafting her opening brief to avoid mention of the document), 2 (accusing Plaintiff of "completely ignor[ing]" the document), 3 (accusing plaintiff of "go[ing] out of her way to avoid discussing the terms" of the document).  Defendant cites to the following documents that it asserts reflect an awareness on Plaintiff's part that the document offered as Exhibit B governed Plaintiff's claim: 1)  Plaintiff's First Amended Complaint, in which Plaintiff alleges that

---

[3]On March 9, 2011, Defendant produced to Plaintiff documents Bates stamped DEF 000001 - 000344.  Declaration of Brent Dorian Brehm in Support of Plaintiff's Responsive Trial Brief ("Brehm Response Decl."), ¶ 2 & Ex. A.  Among these documents was a document entitled "Summary Plan Description: The SBC Global Umbrella Plan No. 1." DEF 67-83.

United States District Court

For the Northern District of California

1   she is seeking long-term disability benefits under the "SBC Disability Income Plan," which is a

2   "sub-plan" under the AT&T  Umbrella Benefit Plan No. 1 (First Amended Complaint, ¶ 2); 2)

3   Defendant's Answer, in which Defendant states in response to paragraph 2 of the First Amended

4   Complaint that it  "admits that Plaintiff was a member of the AT&T Disability Income Plan . . .,

5   which is a component of the [AT&T Umbrella Benefit Plan No. 1] (Answer to First Amended

6   Complaint); 3) the January 21, 2011 Joint Case Management Conference Statement, stating that

7   Plaintiff was seeking reinstatement of long term disability benefits under the "AT&T Disability

8   Income Plan, which is a component of the AT&T Umbrella Benefit Plan No. 1;" and 4) the April 22,

9   2011 Updated Joint Case Management Conference Statement, stating again that Plaintiff was

10  "seeking reinstatement of long-term disability . . . benefits under the AT&T Disability Income

11  Plan."  Defendant also provides a declaration by counsel stating that prior to the settlement

12  conference in this case, she attached the "pertinent portions of the AT&T Disability Income Plan as

13  an Exhibit" to Defendant's settlement conference statement, which Defendant exchanged with

14  Plaintiff.  Declaration of Rebecca K. Kimura in Support of Defendant AT&T Umbrella Benefit Plan

15  No. 1's Opposition to Plaintiff's Motion to Strike ("Kimura MTS Opposition Decl."), ¶ 6.

16  According to Defendant's counsel, Plaintiff's assertion that in preparation for the settlement

17  conference she relied upon the materially different plan summary produced to Plaintiff by Defendant

18  opens the door to Defendant presenting evidence of what Plaintiff should have relied upon in

19  formulating her settlement position.

20          In her reply brief, Plaintiff denies that she or her counsel were aware of the document offered

21  as Exhibit B or that she deliberately failed to raise the issue as a "trial tactic."  She points to the

22  assertions by Defendant, both to Plaintiff and to the Court, that it had complied with the Court's

23  order to produce information relevant to the relationship between the Plan and the claim

24  administrator, and that Defendant had produced the entire file concerning Plaintiff's claim for

25  disability benefits.  *See* Docket No. 25 (Updated Joint Case Management Statement filed April 22,

26  2011 including Defendant's representation to Plaintiff and the Court that it had "provided Plaintiff

27  with the Administrative Record which contains the entire file concerning Plaintiff's claim for

28  disability benefits, totaling 1,066 pages" and that "the documents which have been produced are

United States District Court

For the Northern District of California

1    complete and satisfy the order of the Court").  Plaintiff also points to the inconsistencies in the

2    record relating to the names of the different plan documents, arguing that as a result of these

3    variations, Plaintiff's statements that her claim was governed by the AT&T Disability Income Plan

4    do not support an inference that she must have been aware that the document offered as Exhibit B

5    existed and governed Plaintiff's claim.  Finally, Plaintiff argues that Defendant violated Rule 408 of

6    the Federal Rules of Evidence when it attempted to introduce evidence relating to settlement

7    negotiations, namely, that excerpts from the document offered as Exhibit B were attached to

8    Defendant's settlement conference statement.  Plaintiff does state, however, that the excerpts did *not*

9    include the language that Defendant argues makes the document an official plan document.

10                                          **c.       AR 1067-1301**

11            Plaintiff asks the Court to strike the documents carrying Bates numbers AR 1067-1301 on

12   the basis that Defendant submitted these documents as part of the administrative record  for the first

13   time on September 23, 2001 without offering any justification for failing to produce these additional

14   pages with the original record produced earlier in the case or any explanation for its representations

15   to Plaintiff and the Court that the entire administrative record had been produced.  To the extent

16   these pages also include the document offered as Exhibit, Plaintiff reiterates the arguments made in

17   connection with that document.  Plaintiff also states that a hard copy of the expanded administrative

18   record lodged with the Court on September 23, 2011 was not served by Defendant on Plaintiff,

19   despite the statement in the notice of lodging that a hard copy would be served on all parties.

20            Defendant responds that all of the documents contained in the expanded administrative

21   record except those that correspond to Exhibit B were provided to Plaintiff in March 2011.  As to

22   Exhibit B, Defendant argues that Plaintiff was aware of this document as well, as discussed above.

23   Defendant does not respond to Plaintiff's assertion that Defendant failed to serve a hard copy of the

24   expanded record on Plaintiff.

25

26

27

28

United States District Court

For the Northern District of California

**2.** **Legal Standard**

**a.** **Whether Rule 26(a)(1) Applies in this Case**

As a threshold matter, the Court must determine whether Rule 26(a)(1) of the Federal Rules of Civil Procedure governs the parties' discovery obligations with respect to the discovery that was ordered by the Court in this action.  The Court concludes that it does not.

Rule 26(a) of the Federal Rules of Civil Procedure requires that parties make initial disclosures of certain information and documents, including, *inter alia*: 1)"the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses;" and 2) "a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i) & (ii).  Rule 26(e) further requires parties to supplement their initial disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." However, Rule 26 exempts from initial disclosure requirements certain types of actions, including "action[s] for review on an administrative record."  Fed. R. Civ. P. 26(a)(1)(B)(i).

The language of Rule 26 does not address whether an action for review on an administrative record that also involves issues *outside* of the administrative record, such as an ERISA case in which there is a possible conflict of interest between the claim administrator and the plan, is exempt from Rule 26 disclosures.  Based on the scant case law the Court has found addressing the question, the Court concludes that the discovery requirements of Rule 26 may apply in ERISA cases seeking review of an administrative record where, as here, the existence of a conflict of interest is at issue and the court has ordered that the parties engage in discovery on this question.  In particular, in a handful of cases, courts have ordered parties to comply with Rule 26 disclosure requirements in cases involving ERISA disability claims where the court found that discovery was appropriate on the question of whether there was a conflict of interest.  *See Hamma v. Intel Corp.*, 2008 WL 648482 (E.D. Cal. March 4, 2008) (granting plaintiff's request that the court issue an order requiring the parties to comply with the Rule 26 initial disclosure requirement on the ground that discovery

United States District Court

For the Northern District of California

1   outside the administrative record was appropriate); *Golden v. Sun Life Financial, Inc.*, 2008 WL

2   2782736 (M.D.Ala., July 15, 2008) (holding that in ERISA case involving "more than just the

3   administrative record" and in which parties were going to be engaging in discovery, parties were

4   required to provide initial disclosures in accordance with Rule 26(a)) (citing *Hamma v. Intel Corp.*);

5   *see also Nolan v. Heald College*, 551 F.3d 1148, 1155 (9th Cir. 2009) (holding that "traditional rules

6   of summary judgment apply to evidence outside of the administrative record in ERISA cases").

7        Here, however, the parties disputed whether initial disclosures were required and the Court

8   resolved that dispute by not issuing an order requiring initial disclosures but rather, issuing only

9   discovery orders specifically identifying certain types of evidence that Defendant was required to

10  produce on the question of conflict of interest.  Docket No. 23.  When Defendant represented to the

11  Court that it had produced all of the documents required under the Court's orders, the Court found

12  that no further discovery was necessary.  Under these circumstances, the Court concludes that the

13  initial disclosure requirements of Rule 26 do not apply in this action.

        **b.**       **Court's Power to Impose Sanctions Under Rule 37**

15       Rule 37 of the Federal Rules of Civil Procedure grants courts the authority to impose

16  sanctions – including preclusion sanctions – where a party has violated a discovery order.  Fed. R.

17  Civ. P. 37(b).  In particular, Rule 37(b)(2) provides, in relevant part, as follows:

18      Sanctions in the District Where the Action Is Pending.

19  (A) For Not Obeying a Discovery Order. If a party or a party's officer, director, or managing
20  agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to
    provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court
    where the action is pending may issue further just orders. They may include the following:

22      (i) directing that the matters embraced in the order or other designated facts be taken
    as established for purposes of the action, as the prevailing party claims;

23      (ii) prohibiting the disobedient party from supporting or opposing designated claims
    or defenses, or from introducing designated matters in evidence;

24      (iii) striking pleadings in whole or in part;

25      (iv) staying further proceedings until the order is obeyed;

26      (v) dismissing the action or proceeding in whole or in part;

27      (vi) rendering a default judgment against the disobedient party; or

28

**United States District Court**

For the Northern District of California

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

. . .

(C) Payment of Expenses. Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(b)(2). Courts have held under Rule 37(b) that "[e]videntiary preclusion is a harsh sanction that generally is not imposed where the failure to provide discovery was either substantially justified or harmless." *Rooney v. Sierra Pacific Windows*, 2011 WL 2149097, at * 3 (N.D.Cal.,June 1, 2011).

In addition, Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, the Ninth Circuit described the history and purpose of this subsection as follows:

This particular subsection, implemented in the 1993 amendments to the Rules, is a recognized broadening of the sanctioning power. *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir.1998) ("[T]he new rule clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule...."). The Advisory Committee Notes describe it as a "self-executing," "automatic" sanction to "provide[ ] a strong inducement for disclosure of material...." Fed.R.Civ.P. 37 advisory committee's note (1993). Courts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded. *Ortiz-Lopez*, 248 F.3d at 35 (although the exclusion of an expert would prevent plaintiff from making out a case and was "a harsh sanction to be sure," it was "nevertheless within the wide latitude of" Rule 37(c)(1)). . . .Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless. Fed.R.Civ.P. 37(c)(1). . . Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness.

259 F.3d 1101, 1106 (9th Cir. 2001). In *Yeti*, the Ninth Circuit upheld the district court's exclusion of the defendant's only damages expert, even though in doing so the court made it "almost impossible" for the defendant to rebut the plaintiff's damages case, where the report was submitted two years after discovery closed and 28 days before trial. *Id.* The court reasoned that the late disclosure was not harmless because the plaintiff would have had to depose the damages expert in order to adequately prepare for trial and therefore was greatly hampered in conducting the trial. *Id.*

United States District Court

For the Northern District of California

In *Melczer v. UNUM Life Ins. Co.*, a district court reached a similar result based on *Yeti*. 259 F.R.D. 433 (Ariz. 2009). In that case, the plaintiff asserted that he had been wrongful denied long-term disability benefits by an ERISA benefit plan, and the court ordered discovery related to the applicable standard of review. *See* United States District Court for the District of Arizona, Case No. C-07-2560, Docket Sheet. Prior to trial, the plaintiff brought a motion in limine asking the court to exclude 526 pages of documents that he asserted were not timely disclosed by the defendant. 259 F.R.D. at 433. The defendant asserted that it had orally disclosed the documents to plaintiff prior to the close of discovery, when defendant's counsel discussed the documents with plaintiff's counsel, and therefore, the disclosure was not untimely. *Id*. at 434. The defendant argued in the alternative that the untimely disclosure was substantially justified by the plaintiff's refusal to sign a stipulated protective order. *Id*. at 435. Finally, the Defendant argued that *Yeti* was distinguishable because that case involved production of an expert report rather than documents. *Id*. at 435.

The court in *Melczer* rejected the defendant's arguments and granted the motion in limine excluding the documents. *Id*. at 436. First, it rejected the defendant's contention that the disclosures were timely because defendant's counsel had orally notified plaintiff's counsel about the documents, holding that under Rule 26(a)(4), disclosures must be "in writing, signed and served." *Id*. at 434. Second, the court found that the late production was not substantially justified on the basis of the delay resulting from plaintiff's refusal to sign the protective order because the defendant had not asked the plaintiff to sign the protective order until *after* the discovery deadline had passed and moreover, the defendant ultimately produced the documents even though the plaintiff continued to refuse to sign the protective order. Third, the court found that the late production was not harmless because Plaintiff would have sought (and presumably would have been permitted) additional discovery relating to the documents. *Id*. at 436. The court noted that although "it would theoretically be possible for the Court to reopen discovery for these matters, doing so would lead to increased costs and delay to Mr. Melczer as well as a substantial delay and inconvenience for the Court." *Id*. Finally, the court rejected the defendant's attempt to distinguish *Yeti* on the basis that that case involved the late production of an expert report under Rule 26(a)(2) as opposed to disclosure under Rule 26(a)(1), finding that "Rule 37(c)(1) makes no such distinction." *Id*.

**United States District Court**
For the Northern District of California

### 3. Analysis

#### a. Chreisman and Hagestad Declarations

Because the Court finds that the initial disclosure requirements of Rule 26 do not apply in this action, the Court rejects Plaintiff's assertion that these declarations must be precluded under Rule 37(c)(1). Preclusion sanctions also are not warranted under Rule 37(b) because no discovery order in this case required Defendants to reveal the identities of Hagestad and Chreisman before their declarations were submitted in support of their trial materials. Further, even if Defendant was required to disclose the identities of these witnesses earlier in the case, preclusion would not be appropriate under Rule 37 because the late disclosure of these witnesses was harmless. Although Plaintiff suggests that the declarations may conflict with the ASA, the Court concludes that the statements regarding flat payment are not inconsistent with the ASA. The Court also notes that in her trial brief Plaintiff has not relied on the accuracy criterion in the ASA to establish a conflict of interest and therefore, to the extent the declarations of Hagestad and Chreisman might conflict with the ASA, that conflict is unlikely to have any impact on the outcome of this case. Further, the Court is satisfied, based on the Hagestad MTS Declaration, that the administrative record has not been altered by Hagestad and therefore concludes that Plaintiff was not prejudiced as a result of Defendant's failure to disclose Hagestad as a witness prior to trial.

The Court also finds that to the extent Plaintiff challenges the statements in the Chreisman and Hagestad Declarations under Rule 602 of the Federal Rules of Evidence, the declarations are admissible because they are supported by personal knowledge. In particular, both declarations indicate that these individuals have personal knowledge of the information contained in their declarations relating to the processing of Plaintiff's claim by virtue of their job responsibilities. *See In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000)( "Personal knowledge may be inferred from a declarant's position") (citing *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1330 (9th Cir.2000) ("As a corporate officer of SRF, Ananda Mata could be expected to know the identity of SRF employees and their tasks."); *Barthelemy v. Air Line Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir.1990) (CEO's personal knowledge of various corporate activities could be presumed)).

1    Therefore, the Court **OVERRULES** Plaintiff's objections to the Chreisman and Hagestad

2    Declarations and **DENIES** Plaintiff's request to strike these declarations.

3              **b.        Exhibit B to Chreisman Declaration**

4         In contrast to the declarations discussed above, which do not fall within the scope of the

5    Court's discovery orders in this action, Exhibit B contains language that goes to the relationship

6    between the Plan and its claim administrator and therefore should have been produced in response to

7    those orders.  Therefore, the Court must consider whether preclusion sanctions are warranted.

8    Because the Court finds that Rule 26 initial disclosure requirements do not apply in this case,

9    Plaintiff's request for preclusion of Exhibit B is governed by Rule 37(b) rather than Rule 37(c).

10   Under either section, however, the standard for determining whether preclusion sanctions are

11   appropriate is whether Defendant's failure to timely disclose the document offered as Exhibit B is

12   substantially justified or harmless.

13        It is clear that Defendant's late production of this document is not substantially justified.

14   Defendant represented to the Court that it had produced the entire administrative record and had

15   fully complied with the Court's discovery order many months ago.  Then, on the eve of trial, it came

16   forward with a document that it claimed was the operative plan document, arguably the most

17   important legal document in the case, without offering any justification for its failure to produce the

18   document other than "inadvertence."  The more difficult question is whether the Plan's late

19   production of the document is harmless.

20        On the one hand, the Court rejects Defendant's contention that its late production of Exhibit

21   B was harmless because Plaintiff was aware of that the document's existence.  Plaintiff's

22   representation that she and her counsel were not aware prior to the submission by Defendant of its

23   pre-trial materials that Defendant had failed to produce a key plan document in the case is entirely

24   credible in light of  the inconsistent and confusing titles used by Defendant to describe the plan

25   documents in this case, as well as the fact that Defendant had assured Plaintiff and the Court on

26   more than one occasion that it had produced the complete record.  On the other hand, it is not clear

27   that the late production of the document resulted in prejudice comparable to that found in *Melczer*

28

1   and *Yeti*, where parties were prevented from obtaining specific discovery that could reasonably have

2   been material.

3        The Court declines to decide this issue, however, because, as discussed below,  Plaintiff is

4   entitled to an award of benefits under either a de novo or an abuse of discretion standard.  Therefore,

5   the Court assumes without deciding that Exhibit B is admissible.

6             **c.   AR 1067-AR 1301**

7        Plaintiff objects to the introduction of AR 1067-AR 1301 as part of the administrative record

8   at trial on the basis that these pages were not included in the administrative record that was produced

9   by Defendant to Plaintiff earlier in the litigation.  Defendant counters that all of these pages were

10  produced to Plaintiff in March 2011 except the Summary Plan Description of the AT&T Disability

11  Income Plan (Chreisman, Ex. B).   Under Civil Local Rule 16-5, Defendant was required to file and

12  serve a copy of the administrative record within 90 days of receipt of service of the summons and

13  the complaint.  Nonetheless, the Court finds that except as to the pages of the Administrative Record

14  that correspond to Exhibit B, as to which the Court declines to rule, preclusion sanctions are not

15  justified because the error was harmless.  In particular, Plaintiff does not dispute that all of the new

16  pages in the expanded administrative record except those that are contained in Exhibit B were

17  produced to Plaintiff in response to the Court's discovery order.  Therefore, the Court

18  **OVERRULES** Plaintiff's objection to those pages except with respect to Exhibit B.

19       **B.   Defendant's Objection and Motion to Strike Exhibit A to Brehm Declaration**

20       Defendant objects to the documents offered by Plaintiff in Exhibit A to the Declaration of

21  Brent Dorian Brehm ("Brehm Decl.") on the basis that these documents are not properly

22  authenticated.  Plaintiff asserts that these documents were offered because the hard copy of the

23  administrative record that was produced to Plaintiff was, in many places, illegible. Because Plaintiff

24  has now submitted a trial brief replacing citations to Exhibit A with citations to the administrative

25  record, the Court need not rely on the documents contained in Exhibit A.  Therefore, the objection is

26  **OVERRULED** and Defendant's Motion to Strike is **DENIED** as moot.

27

28

### C.   Defendant's Motion in Limine No. 1 to Preclude Evidence or Argument Regarding Conflict of Interest

Defendant brings a motion in limine asking the Court to preclude Plaintiff from arguing or introducing any evidence of a conflict of interest on the grounds that: 1) Plaintiff did not allege a conflict of interest in her First Amended Complaint; and 2) the court denied discovery on the question of conflict of interest.  The motion is **DENIED.**  Defendant has not cited any authority that requires a plaintiff in an ERISA case to allege the existence of a conflict of interest and the Court does not find any.  In addition, the Court's ruling at the June Case Management Conference that no further discovery was required on the question of the relationship between the Plan and its third-party claims administrator was not a legal ruling on the question of whether a conflict of interest exists. The motion is **DENIED**.

### D.   Defendant's Motion in Limine No. 2 to Preclude Introduction of Evidence of the Claim File that is not Part of the Administrative Record

Defendant's second motion in limine seeks to preclude the documents attached to the Brehm Declaration as Exhibit A.  For the reasons stated above, the motion is **DENIED** as moot.

### E.   Defendant's Objection to Plaintiff's Late-Filed Proposed Findings of Fact and Conclusions of Law

On October 28, 2011, Defendant filed an objection to Plaintiff's late filing of its proposed findings of fact and conclusions of law, asserting that because the proposed findings were filed five days late, Defendant's ability to prepare for trial was hampered.  The objection is **OVERRULED** on the basis that Defendant is not prejudiced by the late filing to the extent that Plaintiff's proposed findings of fact and conclusions of law simply mirror the arguments raised in Plaintiff's trial briefs, which were timely filed.

## IV.   FINDINGS OF FACT

### A.   The Disability Plan

Plaintiff has been employed by AT&T (or its predecessor) since she was 18 years old, when she was hired, in 1988, by Pacific Bell as a telephone operator.  At all relevant times she has been covered by the AT&T Disability Income Plan  ("Disability Plan"), which is a component of the

larger AT&T Umbrella Benefit Plan No. 1.  The relevant terms of the Disability Plan are set forth in the document entitled "Summary Plan Description: AT&T Disability Income Program" (hereinafter, "SPD") in which it is stated that it is "the official document of the AT&T Disability Income Program."  Under the Disability Plan, an employee is eligible for long-term disability benefits if she is totally disabled, where "total disability" is defined as follows:

> "Total Disability" or "Totally Disabled" for long-term disability means that because of an Illness or Injury you are prevented from engaging in any employment for which you are qualified or may reasonably become qualified based on education, training or experience. You will be considered Totally Disabled for a long-term disability if you are incapable of performing the requirements of a job other than the one for which the rate of pay is less than 50 percent of your Pay (prior to any offsets) at the time your long-term disability started.

Under the Disability Plan, AT&T Inc. is the Plan Administrator and has "sole and absolute discretion to interpret the provisions of the [Disability Plan], make findings of fact, determine the rights and status of participants and others under the [Disability Plan], and decide disputes under the [Disability Plan].  Further, the "Plan Administrator may delegate any of its duties or powers."

The Disability Plan provides that long-term disability ("LTD") benefits will end in the event an individual "no longer[s] meet the requirements for Partial Disability or Total Disability as determined in the sole discretion of the Claims Administrator."  Sedgwick Claims Management Services, Inc. ("Sedgwick") was selected by AT&T Inc. as the claims administrator to manage the Disability Plan.  The team of Sedgwick employees who are assigned to work on claims for LTD disability benefits under the Disability Plan is referred to as the AT&T Integrated Disability Service Center ("IDSC").  Appeals of the denial of benefit claims under the Disability Plan are decided by Sedgwick's Quality Review Unit ("QRU").  The QRU decides disability claims based upon the information that was before the IDSC in making the initial decision to deny the claim, the issues and comments submitted by the participant employee, and such other evidence as the QRU may independently discover.  The QRU may seek assistance from independent medical advisors in evaluating claims and analyzing medical evidence in support of those claims.

United States District Court
For the Northern District of California

**B.      History of Plaintiff's Claim for Benefits**

On April 3, 2006, Plaintiff stopped working because she was suffering from Chronic Fatigue Syndrome. At the time she stopped working, she was employed as a customer service representative, which is classified as a sedentary occupation.

**a.      Approval of Short-Term Disability Benefits**

Plaintiff's leave was approved for short-term disability ("STD") benefits, effective April 10, 2006, under the Disability Plan.  Plaintiff's leave continued to be approved for STD benefits for 52 weeks through April 8, 2007, which was the maximum period for STD benefits under the Plan.

**b.      Initial Consideration and Approval of LTD Benefits**

On November 29, 2006, IDSC notified Plaintiff that her STD benefits would expire on April 8, 2007 and that she might be eligible for LTD benefits.  Plaintiff was asked to complete an LTD initial form packet, which included a "statement of claim" form, a "Training, Education and Experience Statement," W-4 forms, a medical release form and an authorization allowing the Social Security Administration ("SSA") to release to the IDSC information about an award or denial of benefits by the SSA.  In addition, the letter explained that in order to be eligible for LTD benefits, Plaintiff would be required to apply for Social Security Disability benefits within three months of her LTD start date.  In support of her claim, Ms. Peterson submitted an employee statement and a Training, Education Experience Statement.  In addition, her treating physician, Dr. Francisco Garcia, who previously had sent letters in support of Plaintiff's STD benefits claim, completed an "Addendum Disability Statement," dated January 26, 2007.   In that letter,  Dr. Garcia stated that Ms. Peterson was suffering from persistent symptoms of severe fatigue, even when sleeping 10-12 hours per night, and napping 2-3 hours in the afternoon.  On February 5, 2007, IDSC had an [in-house] physician, Dr. Thomas K. Ehni, review Ms. Peterson's records.  Dr. Ehni noted that Ms. Peterson had subjective complaints of severe fatigue and that there was "indication that" she had been sleeping 10-12 hours each night and several hours during the day.  However, Dr. Ehni's opined that he was unable to determine if there was a "medical basis for her fatigue versus a psychological cause."  Consequently, Dr. Ehni concluded that there was no basis for any work restrictions or

United States District Court

For the Northern District of California

1    limitations "from a medical standpoint."  On February 8, 2007, the IDSC sent Plaintiff a letter

2    informing her that LTD benefits had been denied, effective April 9, 2007.

3         Plaintiff appealed the denial, submitting a handwritten Appeal Form on April 2, 2007 as well

4    as letters from: 1) Dr. Garcia; 2) Dr. Richard Stack, an infectious disease specialist who had treated

5    Plaintiff's HIV; and 3) Karen Giordano, a licensed therapist.   Dr. Garcia addressed Dr. Ehni's

6    opinion that Plaintiff's fatigue might be a result of her depression rather than a medical condition,

7    stating in part, as follows:

8         Currently, her symptoms as you are aware have been present for > 6 months, and include
          prolonged fatigue following minimal exertion, sleeping 2-3 hours per day during day in
9         addition to prolonged sleeping at night, frequent fevers ranging from 99.6 to 100.5 F,
          intermittent lymphadenopathy, chronic sore throat, generalized aches and headaches.

10        I have included the diagnostic criteria for chronic fatigue syndrome taken from the CDC
11        below:

12        Diagnostic criteria
          CFS was defined by a panel of experts in 1988 as an illness lasting at least six months,
13        characterized by chronic or recurrent debilitating fatigue combined with at least 6 of the
          following chronic symptoms: headeach, fever or feverishness, sore throat, muscle aches,
14        joint pains, generalized muscle weakness, lymph node pain, prolonged fatigue following
          exercise, sleep alterations, and various nervous system complaints, for which no likely
15        explanation has been identified after thorough medical and laboratory evaluation.

16        There is no absolute means of confirming the diagnosis of CFS.  No known laboratory tests
17        are of proven diagnostic value.

          As you can see, Ms. Peterson easily meets the criteria for chronic fatigue syndrome. . . . .
18
          At this point, Ms. Peterson remains disabled due to her chronic fatigue syndrome.  She does
19        also have depression which is being treated as an industrial injury by another physician
          however this would not explain the constellation of her symptoms.
20

21        Dr. Stack wrote in his letter that he had "been following Ms. Peterson for multiple medical

22    problems since November 2005" and that during that time she "complained of continuous fatigue,

23    intermittent swollen glands and body aches."   According to Dr. Stack, these symptoms "would

24    appear to be compatible with a diagnosis of chronic fatigue syndrome."  Dr. Stack further opined

25    that Plaintiff's "other medical problems and medications do not explain these findings."

26        Finally, Ms. Giordano wrote a letter stating that opinions that she had provided to a

27    Sedgewich disability specialist who was working on Plaintiff's claim had been mischaracterized in a

28    letter to Plaintiff, that she had been prepared to participate in a conference call that was scheduled

1   with her and the "physician with AT&T" but that the AT&T team "did not follow up with the

2   conference call as scheduled,"and that "Ms. Peterson's ability to function has been significantly

3   compromised by her persistent and pervasive symptoms."

4          IDSC sent Plaintiff's file to an "independent review organization" called Independent

5   Insurance Appeals, Ltd (aka NMR).  On April 24, 2007, Dr. Gary P. Greenhood wrote a report in

6   which he evaluated Plaintiff's claim that she was unable to work in any occupation due to Chronic

7   Fatigue Syndrome.  Dr. Greenhood reviewed Ms. Peterson's medical records (which dated back to

8   her date of disability), as well as the above letters, and reached the following conclusions:

9          The diagnosis responsible for an inability to perform full-time work is Chronic Fatigue
           Syndrome.

10
           ...

11
           The rationale for an inability to perform full-time work is fatigue sufficiently severe to
12         preclude 8 hours of continuous, sustained work per day.

13         . . .

14         The expected/appropriate length of the inability to perform full-time, reliable work cannot be
           determined….Records do not support a prediction of how this claimant will evolve.

15
           …

16
           Clinical findings include enumeration by Dr. Garcia of the CDC criteria for a diagnosis of
17         Chronic Fatigue Syndrome and agreement by Dr. Stack with the diagnosis of Chronic
           Fatigue Syndrome.

18
           ...
19         All findings are clinically significant.

20         Dr. Greenhood addressed Plaintiff's other medical conditions, rejecting Epstein Barr virus

21   and HIV as possible grounds for substantiating Ms. Peterson's disabling symptoms.  In closing, Dr.

22   Greenhood wrote:

23         Drs. Garcia and Stack agree that this claimant has Chronic Fatigue Syndrome. The submitted
           documentation supports this diagnosis. No exclusionary criteria to the diagnosis are evident.
24         No issues regarding the credibility of either the claimant or her providers are raised. In view
           of symptoms, which include severe fatigue and the requirement for excessive sleep reported
25         by Dr. Garcia, the submitted medical records support an inability to perform full time,
           reliable work (even at the sedentary level) from 2/1/07 to the present.

26

27         On May 31, 2007, IDSC sent Plaintiff a letter informing her that she had been approved for

28   LTD benefits effective April 9, 2007.  IDSC also instructed Ms. Peterson to continue to work with

United States District Court

For the Northern District of California

1   Allsup, a disability advocacy company, in connection with her application for Social Security

2   Disability Insurance benefits (SSDI).  In a letter dated October 25, 2008, the Social Security

3   Administration informed Plaintiff that it had found she was disabled as of April 1, 2006.

4          **c.**        **Termination of LTD Benefits**

5          Following the initial approval of LTD benefits, IDSC required Plaintiff to complete an

6   Employee Questionnaire regarding her activities.  In completing the requested Questionnaire,

7   Plaintiff described a typical day as follows:

8         8-10 hours of sleep needed nightly.  Wake up, have breakfast, read, watch tv, 2-3 hour nap
      needed, watch tv until bedtime.  I might go to the store or have an appointment or church
9         activity.

10   She stated that she performed about three hours of housework per week, had friends help her with

11   yard work, and participated in church activities, including bible study one to two times per week,

12   babysitting in the church nursery once a month and helping for an hour or two occasionally at

13   special events.  Plaintiff wrote that her inability to work was because of her need for 10-13 hours

14   of sleep per day, her daily body aches, low grade fevers, swollen glands, trouble concentrating, and

15   need for sleep after just a few hours of minimal activity.  In answering the question "Do you have

16   plans to return to work in the future?" Plaintiff wrote, "Yes – when I'm no longer sick."

17          Plaintiff's doctors also continued to provide updates on Plaintiff's medical condition in

18   response to requests from IDSC.  In August of 2007, Dr. Stack submitted answers to IDSC's

19   questions regarding Plaintiff.  He stated that Plaintiff continued to suffer from fatigue, that her

20   "progress . . . over the past several months" was "stable" and that she was unable to return to work

21   due to fatigue.  Dr. Garcia also responded to the same questions.  Dr. Garcia described Plaintiff's

22   symptoms as follows:

23         Ms. Peterson still has severe fatigue.  She is sleeping 12 hours per night and naps 2 hours per
      day.  Minimal activity leads to increased symptoms.  She has generalized aches and also
24         periodically gets lymphadenpathy or lymph node tenderness.  She has tactile fevers although
      her measured temps have now decreased to normal.
25

26   Dr. Garcia stated that Plaintiff's "severe fatigue and myalgias prevent her from returning to work at

27   this time" and that she "has not been able to participate in anything more than sedentary activities

28   for greater than a two hour stretch."

In March of 2008, IDSC requested that Plaintiff complete another Long Term Disability Questionnaire and to provide updated medical records for the period September 1, 2007 to the present.  Again, Plaintiff described a typical day, noted that she was no longer had the energy to keep her house clean, required assistance with yard work, and that these household activities were physically difficult because they caused her muscle pain.  Plaintiff continued to be active in church activities including women's small group, volunteer activities, and Sunday services.  However, she stated that when she did volunteer work, it took her "several days to recover from helping out."  Plaintiff stated that she was unable to work because she could not do anything for more than two or three days in a row without feeling "wiped out."  She reported that she needed a daily nap of two to three hours, and that unless she slept 10-12 hours per night she woke up feeling like she needed a nap.  In response to the question "Do you have plans to return to work in the future?" Plaintiff stated, "Yes if my health returns."

IDSC also received updated treatment records from Dr. Garcia and Ms. Giordano. Dr. Garcia's records documented his treatment of Plaintiff on September 21, 2007, November 7, 2007, November 10, 2007, January 17, 2008, February 8, 2008, February 25, 2008, and March 10, 2008. During these visits, Dr. Garcia noted that Ms. Peterson was sleeping 10-12 hours per night, took naps during the day, had fevers that cycled about every three weeks, and had muscle aches/pains.  In Dr. Garcia's February 8, 2008 treatment note he reported that Plaintiff required more sleep if she had to run errands, grocery shop, or go to bible study and that she attempted to take care of household chores by doing only one or two things per day.

Ms. Giordano's progress notes documented 20 visits spanning from September 10, 2007 to March 10, 2008.  These records include numerous references to Plaintiff's fatigue.

On April 15, 2008, IDSC found that Plaintiff continued to be totally disabled, stating in the notes of Plaintiff's claim as follows: "Updated documentation indicates no change in condition and supports [Plaintiff's] inability to sustain any work activities. Therefore, she meets the definition of disability for ltd."

In the fall of 2008, IDSC again reviewed Plaintiff's continued eligibility for LTD benefits. IDSC had Plaintiff complete a third questionnaire.   In the Disability Questionnaire, dated October

United States District Court

For the Northern District of California

31, 2008, Ms. Peterson again described a typical day, stating that after she woke up, ate breakfast and "read daily scripture," she did "one chore around the house that might need to be done," took as 2-3 hour nap and then spent the remainder of the day reading, watching tv and going on the internet. She  stated further that she was co-leader of a bible study group that met twice a month.  Plaintiff stated that she was unable to work because she got "really fatigued after minimal activity" and was "in pain most days."   She stated that she couldn't "stand very long, or sit very long."

IDSC also obtained updated medical records from Drs. Stack and Garcia. Dr. Garcia's updated records spanned from May 1, 2008 to November 3, 2008 and document visits on May 1, 2008, May 14, 2008, May 20, 2008, June 27, 2008, August 8, 2008, October 21, 2008 and November 3, 2008.  In the notes for the May 20, 2008 visit, Dr. Garcia noted that Plaintiff had suffered from a sore throat for about 1 month and was doing better following treatment with Keflex. He also noted that her fatigue was "still about the same," and that she still slept 10-12 hours per night, napped 2-3 hours a day and felt "wiped out" if she engaged in any extra activity, such as a church event.

During Ms. Peterson's June 2008 office visit with Dr. Garcia, she discussed her plans to join her church on a mission trip to Ensenada, Mexico.   Because the Plan required Ms. Peterson to get IDSC's approval for any travel, Ms. Peterson had already discussed this trip with IDSC. IDSC told Ms. Peterson to obtain medical clearance for the trip.  In a letter dated June 27, 2008, Dr. Garcia cleared Ms. Peterson to travel, instructing her to take frequent breaks and rest as needed. The June 27 letter stated as follows:

> Ms. Peterson has been under my care for several medical problems including chronic fatigue syndrome.  She is medically cleared to travel with her church group on a mission to Ensenada, Mexico.  Mission goals are to provide supplies and share faith.  She is able to adjust her schedule. She [is] instructed to take frequent breaks on her ride to Ensenada and rest frequently as needed but is otherwise cleared to travel in July 2008.  In addition, she is planning to travel to Redding, CA to meet her family at a family cabin for the weekend.  The purpose of the trip is purely leisure and she is cleared to travel.

Dr. Stack submitted a report from March 3, 2008.  That report stated that Plaintiff was being "followed . . . for HIV, somewhat . . . sporadically."  Dr. Stack noted that Plaintiff had recently had "muscle pain" and that Dr. Garcia had "stopped her Tricor" in response.  He stated that she had had her "first elevated viral load in some time of a borderline nature," and that if Plaintiff's viral load

1   continued to test positive, he would have to "consider changing her therapy."   Apart from this

2   virological deterioration, Dr. Stack found that Plaintiff's HIV was "immunologically doing great."

3        On November 13, 2008, IDSC determined that the "[u]pdated documentation indicates no

4   change in condition and supports [Ms. Peterson's] inability to sustain any work activities. Therefore,

5   she meets the definition of disability for ltd."

6        The next day, on November 14, 2008, Plaintiff's therapist, Ms. Giordano, submitted therapy

7   records for the period July to October 2008, during which Plaintiff saw Ms. Giordano on a weekly

8   basis.   In many of the entries, Ms. Giordano described Plaintiff as looking "tired" or "very tired."

9   In her notes describing a session on July 21, 2008, Ms. Giordano wrote that Plaintiff "did not go on

10  her mission to Mexico with her trip as planned because she wasn't feeling well and was

11  overwhelmed."

12       In April 2009, IDSC initiated another review of Plaintiff's eligibility for LTD benefits and

13  requested that Plaintiff provide an updated questionnaire and medical records.   Plaintiff submitted

14  an updated questionnaire dated June 5, 2009.   Ms. Peterson stated that on a typical day she ate

15  breakfast, read scripture, checked email, made "any necessary phone calls," ran "any necessary

16  errands" and went to "any appointments." She also stated that she performed various household

17  chores, but noted that she tried "to just do 1 to 2 things per day."   She stated that her participation in

18  bible study and other church activities had slowed down and stated that her body got "too sore" to sit

19  at her computer desk for more than an hour at a time. She stated that she was unable to work because

20  she "got fatigued very quickly."   According to Plaintiff, she could "usually do chores for an hour,

21  but then [she needed] to nap." In answering the question "Do you have plans to return to work in the

22  future?" Plaintiff wrote, "Yes – I hope to return to work in the future."

23       On June 8, 2009, IDSC received laboratory results and notes from Dr. Stack concerning

24  Plaintiff's office visits on December 9, 2008, March 25, 2009 and June 4, 2009.  The reports stated

25  that Plaintiff was being followed by Dr. Stack for her HIV and reported that with respect to her HIV

26  she was "virologically and immunologically doing excellent."   Dr. Stack noted, however, that

27  Plaintiff suffered from "some fatigue."   In Dr. Stack's March 25, 2009 report, he stated that "Patient

28  is desperately wanting to have a child" and that "[s]he had tried foster care but she believes her HIV

status does distract in getting a kid placed with her and so she is looking for artificial insemination." In the notes from the same visit, Dr. Stack wrote as follows:

> We did talk about the possibility of pregnancy. I think this is the best time she has to have the lowest risk situation in terms of conception and not to pass the virus on to the baby and of course she would not be breastfeeding. We reviewed medication choices and certainly pregnancy is not unreasonable at this point.

In his notes from Plaintiff's June 4, 2009 visit, Dr. Stack wrote that "[t]he patient comes in today with a foster baby." He continued, "[s]he is still working with the fertility folks about getting pregnant." He also noted that Plaintiff had "several other complaints" and that she had been referred to Dr. Garcia as to these complaints.

On June 10, 2009, IDSC received medical records from Dr. Garcia documenting visits on November 3, 2008, November 13, 2008, March 11, 2009, April 22, 2009 and June 3, 2009. Dr. Garcia's records indicate that in many of these visits Plaintiff complained of pain in her legs and buttocks, fatigue and achiness and low-grade fevers. The notes from the March 11, 2009 visit state that Plaintiff was "very upset" because she had had to give up a foster infant and that she had decided to proceed with in vitro fertilization because she believed she was unlikely to be approved for adoption in light of her HIV positive status. The notes from the March 11, 2009, April 22, 2009 and June 3, 2009 visits incorrectly stated that Plaintiff worked full time as a project manager. Notes from the June 3, 2009 visit state that Plaintiff had a new foster infant and therefore was "more tired."

On June 22, 2009, IDSC sent Ms. Peterson's file for an internal Physician Advisor Review. In making the referral, IDSC referred to Plaintiff's diagnoses of HIV and depression but did not reference her diagnosis of Chronic Fatigue Syndrome.

Two days later, on June 24, 2009, Dr. Shirley A. Conibear performed the requested paper review.  In her report, Dr. Conibear states that she attempted to contact Dr. Stack with reference to her review of Plaintiff's eligibility for LTD benefits but that "Dr. Stack's medical assistant said that he [was] not the one who offered an opinion that the employee is disabled, and he does not want to get involved in the disability process by offering any opinions." Dr. Conibear's report, like the referral, does not mention Chronic Fatigue Syndrome and does not take the symptoms related to that diagnosis into account in reaching her conclusion that Plaintiff was not eligible for LTD benefits.

1   Rather, it focuses on Plaintiff's HIV and depression.  Her report addresses two office visit notes: Dr.

2   Stack's June 4, 2009 note and Dr. Garcia's June 3, 2009 note. She does not reference any other

3   office visits or Plaintiff's questionnaire.   Based on her review, Dr. Conibear found that there was no

4   objective evidence in the record to support disability.  Dr. Conibear's rationale for finding Ms.

5   Peterson capable of sedentary work was that her HIV was in good control, she was trying to become

6   a mother with the support of her treating physicians, and she "has actually been working at a full

7   time position since at least 11/13/08."

8          On July 14, 2009, IDSC sent Plaintiff a letter informing her that it had found that she "may

9   have some work capacity" and that it was initiating a vocational review to determine whether

10   Plaintiff continued to be totally disabled.

11          On July 16, 2009, Karen Giordano (Plaintiff's therapist) sent a letter to IDSC, stating that

12   Plaintiff was diagnosed with Major Depressive Disorder, Recurrent, Moderate and

13   Anxiety Disorder, and that Plaintiff self-reports feeling "sad nearly every day, weight gain,

14   hypersomnia, fatigue and having very little energy, low self esteem, isolating, feeling

15   overwhelmed, excessive worry, perseverating on perceived negative interactions she may have

16   had, and difficulty concentrating," and concluded that Plaintiff's "symptoms seem to interfere

17   with her functioning vocationally and socially."

18          On July 20, 2009, a Transferable Skill Assessment was completed for Plaintiff by IDSC's

19   Job Accommodation Specialist Jessica Castro.  The Assessment states in the initial summary that

20   Plaintiff had been "off work since 4/03/06 due to HIV and depression." The Assessment continues,

21   "She also has a diagnosis of hyperlipedemia, lipodystrophy, polyneuropathy, myalgia and myositis."

22   The Assessment does not mention Plaintiff's diagnosis of Chronic Fatigue Syndrome or the

23   associated symptoms of that diagnosis. The Medical Information section of the report consists of a

24   single sentence, which states that "[f]or the purpose of this assessment I have been asked to utilize

25   the following information as identified by the Case Manager: Ms. Peterson can perform sedentary

26   job duties." (AR 819)  The Assessment concluded that Plaintiff could work as a: 1) customer service

27   representative; 2) sales assistance; or 3) billing clerk.

28

On July 21, 2009, IDSC received notes from an office visit to Dr. Garcia on July 16, 2009. Dr. Garcia wrote that Plaintiff had had stomach flu one month before and had been suffering from "severe fatigue since that time frame."  Plaintiff also reported to Dr. Garcia that she had low fevers ("in the 99's") a few times a week. Chronic Fatigue Syndrome was listed as one of Dr. Garcia's diagnoses.   In addition, Dr. Garcia wrote:

> She is still very symptomatic from her chronic fatigue and disabled from reasonable employment but her greatest desire is to raise a child. Due to her inability to adopt, she wishes to attempt to conceive using artificial insemination as her HIV is currently stable.  At her age, she is aware that she is at high risk for DM, HTN and other complications as well as exacerbation of her chronic illness.  Her chronic fatigue will especially be more symptomatic.  I gave her some Cymbalta 30 to try and slowly continue her wean but warned her that her symptoms may progress with her depression and fatigue.  Pregnancy may also exacerbate her symptoms.

On July 27, 2009, IDSC sent Plaintiff a letter informing her that her claim for continued LTD benefits had been denied, effective August 1, 2009, because she was no longer "totally disabled" as defined by the Plan.  In the letter, IDSC informed Ms. Peterson that "there was no objective medical evidence to support a restriction or limitation of function that would preclude you from performing at a sedentary level of functioning."  IDSC further stated that because a transferrable skills assessment revealed that there were several occupations that Plaintiff could perform, including Sales Representative, Sales Assistant and Billing Clerk, Plaintiff was "not disabled from working in any capacity," as required to receive LTD benefits under the Plan.  IDSC informed Plaintiff that she had the right to appeal the determination by submitting, within 180 days, a written statement stating the reasons the claim should not be denied.  The letter also informed Plaintiff that she could submit "additional medical and vocational information, and any facts, data, questions or comments you deem appropriate for us to give your appeal proper consideration."  Attached to the letter was an "Appeal Procedure" form from the Quality Review Unit.

On November 4, 2009, Plaintiff sent an appeal letter to IDSC.  Therein, Ms. Peterson stated that she was "still suffering from chronic fatigue and major depression" and that there had been "no changes in [her] symptoms since the last renewal of [her] LTD benefits in November of 2008."  In particular,  Plaintiff stated that she "continue[d] to suffer from severe fatigue, muscle aches, swollen glands, low-grade fevers, sleep problems, memory loss, spontaneous crying spells, irritability,

**United States District Court**
For the Northern District of California

1  difficulty concentrating, and many other symptoms associated with chronic fatigue and major

2  depression." Plaintiff challenged IDSC's reliance on notes from Dr. Stack stating that Plaintiff was

3  doing well immunologically, noting that Dr. Stack was her infectious disease doctor and treated only

4  her HIV. Plaintiff also pointed out that she was immunologically stable even at the time when she

5  became disabled, in 2006, and that she been immunologically stable since she was put on "the hiv

6  cocktail regimen more than ten years ago." Plaintiff pointed to Dr. Garcia's notes from July 2009

7  stating that Plaintiff's Chronic Fatigue Syndrome was "very symptomatic" and clarified that the

8  notations in some of Dr. Garcia's reports indicating that Plaintiff was employed were in error and

9  that she had not worked since she became disabled.

10       Ms. Peterson also explained her experience with the foster care/adoption program in her

11  appeal letter, stating as follows:

12       I began going through the foster/adopt program before my disability more than three years
         ago with the intention of adopting a child. However, I had been on the waiting list for three
13       years and had not been chosen to adopt. My caseworker advised me that doing foster care
         temporarily for 6 months might make me a more viable candidate. My first infant came on
14       Christmas day of 2008. I took care of one infant at a time, and only had three total. My
         last child left in June of 2009. My choosing to do emergency foster care for a limited amount of
15       time was about me trying to start my family; it had nothing to do with being recovered from
         chronic fatigue as Ms. Payton [an IDSC claim administrator] seemed to imply. In fact, the
16       social workers mention the chronic fatigue as a factor in why they have not placed a child
         with me for adoption.  After going through that, I decided I probably wasn't going to be able
17       to adopt through the County so I should try to have my own child. Again, I advised Ms.
         Payton that all of my actions had to do with me starting a family, not that I am recovered
18       from chronic fatigue, as I remain very symptomatic.  There aren't any rules I know of that
         state a person cannot attempt to start a family while disabled.

19

20       Plaintiff questioned IDSC's conclusion that she could perform a sedentary job, pointing out

21  that she was performing a sedentary job when she became disabled.  She asked how she could return

22  to the same type of job she had performed when she became disabled when her symptoms had not

23  improved.

24       Attached to Plaintiff's Appeal Letter were: 1) a letter from Dr. Garcia dated September 19,

25  2009 ("the September 19 Letter"); and 2) Dr. Garcia's notes from a September 2, 2009 office visit

26  ("the September 2 Notes").  In the September 19 Letter, Dr. Garcia stated as follows:

27       This letter is written in support of Judi Peterson's appeal of her most recent denial of her
         long term disability. Some of my statements were misinterpreted from my prior notes to
28       suggest that she is no longer disabled. In fact, she remains very symptomatic. She also has

United States District Court

For the Northern District of California

chosen to stop her antidepressant in hopes that she may be able to achieve pregnancy with artificial insemination. Please refer to my most recent progress note from 9/2/09 regarding her most recent symptoms. I am also including the diagnostic criteria for chronic fatigue syndrome:

Diagnostic criteria

CFS was defined by a panel of experts in 1988 as an illness lasting at least 6 months, characterized by chronic or recurrent, debilitating fatigue combined with at least 6 of the following chronic symptoms: headache, fever or feverishness, sore throat, muscle aches, joint pains, generalized muscle weakness, lymph node pain, prolonged fatigue following exercise, sleep alterations, and various nervous system complaints, for which no likely explanation has been identified after thorough medical and laboratory evaluation. There is no absolute means of confirming the diagnosis of CFS. No known laboratory tests are of proven positive diagnostic value. Ms. Peterson continues to meet criteria for chronic fatigue syndrome and remains significantly symptomatic.

Dr. Garcia's September 2 Notes state that the Plan "apparently took some wording in my last note regarding my comment that [Plaintiff's] HIV was stable and also the plan for weaning her Cymbalta as terms for no need for disability." Dr. Garcia continued, "The reason for weaning Cymbalta was only in preparation for pregnancy." Dr. Garcia described her current symptoms as follows: 1) "Depression feels 'worse' since off Cymbalta . . ."; 2) "Intermittent fevers still occur to 100 – usually 2-3 times per week. Frequent temps to 99"; 3) "Feels achy all over and sore muscles all over – magnified when she is busy x3 days such as appointments or shopping when she misses her naps. Her fatigue is constant and sleeps 10 hours at night and naps 1-3 hours mid-day. Can stay up x4 hours before needs to sleep"; 4) "Gets pains in left side of her chest . . . ."; 5) "HIV labs have been stable with Dr. Stack; and 5) "chronic pain in both feet from neuropathy – sometimes hurts to stand."

IDSC again sent Ms. Peterson's records to Insurance Appeals, LTD for paper reviews. Insurance Appeals, LTD (aka NMR) provided IDSC with reviews from Dr. Leonard Sonne, an internist, cardiologist, and pulmonologist; Dr. Robert N. Polsky, a psychiatrist; and Dr. Joel Maslow, an internist and infectious disease specialist.

Dr. Polsky's review focused "exclusively on the psyciatric." Dr. Polsky noted that "the case is also being reviewed by internal medicine and infectious disease." His report states that he attempted to reach Dr. Garcia and Ms. Giordano, leaving messages with both offices that they needed to call him back within 24 hours or his report would be finalized based on the available

United States District Court

For the Northern District of California

medical records. According to Dr. Polsky, neither one returned his call. Dr. Polsky concluded that "from a psychiatric perspective," the available documentation did not establish that Plaintiff was disabled. He reasoned that Plaintiff's "multiple self-reports of subjective symptoms of depression, along with an anxiety state" were not "clearly demonstrated to be of a severe nature." He opined that "[i]n terms of objective findings, there is an absence of documentation that would indicate the claimant ever having been dangerous to self or others or showing signs of mania, psychosis, or severe regression in terms of being able to perform activities of daily living."

Dr. Sonne stated in his report that he called Dr. Garcia's office twice and asked Dr. Garcia to return his call within 24 hours, but that Dr. Garcia did not call back. Dr. Sonne acknowledged in his "Internal Medicine Synopsis" that Plaintiff's history included "chronic fatigue, perhaps from HIV." However, in addressing whether Plaintiff continued to be disabled, he did not evaluate her chronic fatigue because Dr. Sonne was under the impression Ms. Peterson had "stopped working because of a diagnosis of HIV and depression." He found that "from an internal medicine perspective," there was "no objective documentation of any restriction, limitation, or impairment that would preclude full-time work as of 8/01/09 forward." He reasoned as follows:

> The claimant is a female former sales executive with the last day of work on 04/02/06. Apparently, she stopped working because of the diagnosis of HIV and depression. However, the HIV was diagnosed prior to her last day of work. She had multiple provider office visits in 2007, 2008, and 2009, documenting at each visit her chest was clear, heart sounds were normal, her HIV was stable, able to answer questions appropriately, able to provide a detailed medical history, her oxygen saturation on room air was normal, and able to be a foster mother for several children during this history. She is also trying to get pregnant. She is also able to plan church group visits to Mexico. That she was able to drive. There is no objective documentation of any internal medicine restriction, limitation or impairment that would preclude full-time work in any occupation from 8/01/09 forward. She had a transferrable skills assessment on 7/20/09, documenting an excellent work capacity.

In Dr. Maslow's review, he noted that he had attempted unsuccessfully to reach Dr. Garcia, who had not returned Dr. Maslow's call within 24 hours, but that he had reached Dr. Stack. According to Dr. Maslow, Dr. Stack told him that Plaintiff "had no infectious diseases related issues that precluded employments, as her HIV infection was well controlled with a high CD4 count and undetectable viral load." Dr. Maslow concluded that "from an infectious disease perspective" Plaintiff was not disabled. In particular, he stated that "HIV infection is well controlled, and the

diagnosis of chronic fatigue syndrome cannot be corroborrated."  He offered the following

"rationale" in support of his conclusion:

> The claimant has confirmed diagnosis of HIV infection, with excellent virologic control and high CD4 counts, per medical documentation provided for review.  Other diagnosis include [sic] major depression.  She has a history of myalgias and a transient elevation of CPK that was attributed to medication (TriCor), which was stopped.  Complaints and diagnosis of neuropathy cannot be confirmed with the documents supplied for review, since no neurologic examinations were documented and no testing such as EMG/NCV was supplied.  Moreover, there is no evidence that this was an active complaint after 2008, except for one mention by Dr. Garcia without supporting statements as to functional assessment.  Finally, the claimant is stated to have a diagnosis of CFS, as stated by Dr. Garcia to have met CDC criteria.  Although there is persistent fatigue documented, the claimant has a history of major depression and does not meet other criteria for CFS to include sore throats (not related to other illness) and lymphadenopathy that is clinically significant and without other explanation.  The diagnosis of major depression complicates the claim that the patient has a diagnosis of chronic fatigue that cannot be attributed to other causes.  Thus, there are no infectious disease-related illnesses that would preclude full unrestricted employment during the time period under review.

On December 3, 2009, Dr. Polsky submitted a supplemental report following a conversation

with Ms. Giordano on the same date.  According to Dr. Polsky, Ms. Giordano told him how many

times she had seen Plaintiff, that Plaintiff was trying to get pregnant and would not take

antidepressants, was taking an on-line course, and ADLs were normal.  Dr. Polsky stated that

"[b]ased on this additional teleconference" his pervious determination still stood.

IDSC upheld the termination of benefits in a letter dated December 18, 2009 ("December 18

Letter").  In the December 18 Letter, IDSC relied upon the paper reviews provided by Drs. Sonne,

Polsky, and Maslow, as well as the Transferrable Skills Assessment completed by Ms. Castro. IDSC

acknowledged that Plaintiff had been found to be disabled by the Social Security Administration but

noted that "the Social Security Administration applies a different definition of disability than does

the Plan."  The letter further stated that its conclusion differed from that of the Social Security

Administration because it had "access to the following information that was not available to the

Social Security Administration: a transferrable skills analysis and independent physician advisor

specialty reviews with psychiatry, internal medicine, and infectious disease."

**United States District Court**
For the Northern District of California

1    **V.    CONCLUSIONS OF LAW**

2        **A.    Applicable Standard of Review**

3            "A denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a

4    *de novo* standard unless the benefit Plan gives the administrator or fiduciary discretionary authority

5    to determine eligibility for benefits or to construe the terms of the Plan." *Firestone Tire and Rubber*

6    *Company v. Bruch*, 489 US 101, 115 (1989).  Where the administrator has been granted

7    discretionary authority, a denial of benefits is reviewed for an abuse of discretion.  *Id.*  In applying

8    the abuse of discretion standard, courts should take into account any conflict interest on the part of

9    the plan administrator.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006).

10   "[A]n insurer that acts as both the plan administrator and the funding source for benefits operates

11   under what may be termed a structural conflict of interest." *Id* (citing *Tremain v. Bell Indus., Inc.*,

12   196 F.3d 970, 976 (9th Cir.1999)).  Because a structural conflict gives the plan administrator an

13   incentive to pay as little as possible in benefits, the Ninth Circuit has held that the court should apply

14   the abuse of discretion standard in a manner that is "informed by the nature, extent, and effect on the

15   decision-making process of any conflict of interest that may appear in the record." *Id.* at 967.

16           As stated above, under the Disability Plan, AT&T Inc. is the Plan Administrator and has

17   "sole and absolute discretion to interpret the provisions of the [Disability Plan], make findings of

18   fact, determine the rights and status of participants and others under the [Disability Plan], and decide

19   disputes under the [Disability Plan].  Further, the "Plan Administrator may delegate any of its duties

20   or powers."  As it is undisputed that AT&T has delegated its authority to make benefits

21   determinations under the Disability Plan to Sedgewick, the Court reviews the denial of Plaintiff's

22   benefits for an abuse of discretion.  The Court further finds no conflict of interest has been

23   established that affects its application of the abuse of discretion standard under *Abatie*.

24       **B.    Abuse of Discretion Standard**

25           When reviewing for abuse of discretion, the Court "cannot substitute [its] judgment for the

26   administrator's ... [and] can set aside the administrator's discretionary determination only when it is

27   arbitrary and capricious." *Jordan v. Northrop Grumman Welfare Benefit Plan*, 370 F.3d 869, 875

28   (9th Cir.2004), overruled on other grounds by *Abatie*, 458 F.3d at 969.  The Supreme Court has

1    explained that "[a]pplying a deferential standard of review does not mean that the plan administrator

2    will prevail on the merits [but rather] . . . means only that the plan administrator's interpretation of

3    the plan "will not be disturbed if reasonable." *Conkright v. Frommert*, – U.S. – , 130 S.Ct. 1640,

4    1651 (2010) (citing *Firestone*, 489 U.S., at 111, 109 S.Ct. 948).  "An ERISA administrator abuses

5    its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the

6    plan in a way that conflicts with the plain language of the plan or (3) relies on clearly erroneous

7    findings of fact."  *Boyd v. Bert Bell/Pete Rozelle N.F.L. Ret. Plan*, 410 F.3d 1173, 1178 (9th

8    Cir.2005).  A court may  find clear error "when the reviewing court is left with the definite and firm

9    conviction that a mistake has been committed.'"  *Linich v. Broadspire Services, Inc.*, 2009 WL

10   775471, at * 2 (D. Ariz. March 23, 2009) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr.*

11   *Laborers Pension Trust for S. Cal.*, 508 U.S. 602 (1993)).  In *Salomaa v. Honda Long Term*

12   *Disability Plan*, the Ninth Circuit held that in determining whether this standard is met, the court

13   should consider "whether application of a correct legal standard was '1) illogical, 2) implausible, or

14   3) without support in inferences that may be drawn from the facts in the record.'" 642 F.3d 666, 676

15   (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)).

16              **C.      Whether IDSC Abused its Discretion in Terminating Plaintiff's Benefits**

17              Having reviewed the entire administrative record in this case, the Court finds that the

18   termination of Plaintiff's benefits was clearly erroneous because it was illogical and without support

19   in inferences that may be drawn from facts in the record.  The Court reaches this conclusion

20   because: 1) Plaintiff was initially found to be disabled on the basis of Dr. Garcia's reports

21   documenting Plaintiff's symptoms associated with Chronic Fatigue Syndrome, and Dr. Garcia's

22   updated reports reflect that Plaintiff's symptoms remained unchanged; 2) IDSC terminated LTD

23   benefits based in part on the absence of "objective documentation of any internal medicine

24   restriction" when it is undisputed that there are no objective tests for Chronic Fatigue Syndrome; 3)

25   IDSC relied, in part, on the conclusions of the Transferrable Skills Analysis, which was itself based

26   on Dr. Conibear's incomplete review of the record and erroneous belief that Plaintiff had been

27   working full-time for many months; 4) two of the three physicians who conducted a paper review as

28   part of the appeals process, Drs. Polsky and Sonne, did not meaningfully address Plaintiff's Chronic

United States District Court

For the Northern District of California

1    Fatigue Syndrome and the third,  Dr. Maslow, found that Plaintiff did not suffer from Chronic

2    Fatigue Syndrome at all – a finding that Defendants now concede is incorrect; and 5) IDSC failed to

3    engage in a meaningful dialogue to the extent that its denial was based on Plaintiff's efforts to

4    conceive or adopt, including her fostering of three infants, but IDSC failed to seek any medical

5    opinion from Dr. Garcia specifically addressing the implications of this activity for determining

6    whether Plaintiff's CFS continued to render her totally disabled.

7                    **a.    It Was Illogical to Terminate Benefits Where the Only Doctor
                            Who Treated Plaintiff's Chronic Fatigue Syndrome, Which was
8                           the Basis for the Initial Determination, Documented that
                            Plaintiff's Symptoms Remained Unchanged**

9

10           As discussed above, IDSC initially approved Plaintiff's LTD benefits based on the

11   conclusion of Dr. Greenhood, a physician advisor who conducted a paper review of Plaintiff's

12   medical records, that Plaintiff was disabled because of her Chronic Fatigue Syndrome (and not due

13   to her HIV and depression).  In reaching that conclusion, Dr. Greenhood relied on the CDC

14   definition of Chronic Fatige Syndrome and the medical reports by Dr. Garcia documenting

15   Plaintiff's symptoms, as well as Dr. Stack's opinion that Plaintiff's symptoms appeared to be

16   compatible with a diagnosis of Chronic Fatigue Syndrome and that Plaintiff's "other medical

17   problems and medications do not explain these findings."

18           The updated medical records provided by Dr. Garcia do not reflect any significant change in

19   Plaintiff's symptoms of Chronic Fatigue Syndrome in 2009.  In particular, in his reports from 2009,

20   as well as his September 19 Letter to IDSC, Dr. Garcia documented that Plaintiff remained "very

21   symptomatic from her chronic fatigue," that she continued to suffer from achiness and intermittent

22   low-level fevers and that she needed to sleep 10 hours at night and nap 1 to 3 hours during the day.

23   Similarly, Dr. Stack's medical records for 2009 reflect that Plaintiff's HIV continued to be very well

24   controlled.  To the extent that a diagnosis of Chronic Fatigue Syndrome requires that an individual's

25   fatigue cannot be explained by other illnesses or conditions, Dr. Stack's updated records continue to

26   support his earlier opinion that Plaintiff's fatigue was *not* the result of HIV, thus supporting the

27   inference that Plaintiff continued to suffer from Chronic Fatigue Syndrome.  There is nothing in Dr.

28

1  Stack's reports from 2009 that could support an inference that Plaintiff's fatigue was the result of

2  her HIV.

3       To the extent the updated medical records document essentially the same disabling

4  symptoms that the Plan previously found to be disabling, the Plan's termination of Plaintiff's

5  benefits was illogical and, in combination with the additional considerations discussed below,

6  supports a finding of clear error.

7

8                **b.**       **The Plan Acted Unreasonably to the Extent it Relied On Lack of
Objective Medical Evidence of Chronic Fatigue Syndrome**

9       In its December 18 Letter, IDSC cited, *inter alia*, the opinion of Dr. Sonne, who made the

10  broad statement that "from an internal medicine perspective," there was "no objective

11  documentation of any restriction, limitation, or impairment that would preclude full-time work as of

12  8/01/09." To the extent Dr. Sonne's opinion is based on a lack of objective medical measures of

13  Plaintiff's Chronic Fatigue Syndrome, it is illogical because it is undisputed that there are no

14  objective tests for Chronic Fatigue Syndrome. In *Salomaa*, the Ninth Circuit addressed a similar

15  situation and explained as follows:

16        [T]he final denial emphasized Salomaa's normal objective findings, and that there was "no
   underlying condition, such as cancer or HIV disease" to explain his fatigue or weight loss.

17        These reasons were illogical, because such objective measures as blood tests are used to rule
   out alternative diseases, not to establish the existence of chronic fatigue syndrome. There is

18        no blood test or other objective laboratory test for chronic fatigue syndrome. As we said in
   *Friedrich v. Intel Corp.*, the condition "does not have a generally accepted 'dipstick' test"

19        and "[t]he standard diagnosis technique for [chronic fatigue syndrome] includes testing,
   comparing symptoms to a detailed Centers for Disease Control list of symptoms, excluding

20        other possible disorders, and reviewing thoroughly the patient's medical history."

21        As we said in dicta in a fibromyalgia case, "if the administrator had said, 'we will not accept
   fibromyalgia as a diagnosis unless you present objective evidence of it such as positive

22        findings on x-rays,' she would have been demanding what cannot exist...." We now establish
   as holding what was then dicta, that *conditioning an award on the existence of evidence that*

23        *cannot exist is arbitrary and capricious.*

24  642 F.3d at 677 (emphasis added) (citations omitted). Therefore, to the extent the Plan relied on the

25  absence of objective medical evidence of Plaintiff's Chronic Fatigue Syndrome, it abused its

26  discretion.

27

28

United States District Court

For the Northern District of California

1

2

        **c.**       **The Plan's Reliance on the Transferrable Skills Assessment was Unreasonable**

3           In its December 18 Letter, IDSC also relied on the Transferrable Skills Assessment,

4  explaining that this document, along with the opinions of the physicians who reviewed the record in

5  2009, was one of the reasons why the Plan found that Plaintiff was not disabled even though the

6  Social Security Administration had found that she was disabled.  IDSC's reliance on the

7  Transferrable Skills Assessment was unreasonable, however, to the extent that that document

8  incorporated the conclusion of Dr. Conibear that Plaintiff could perform sedentary work.  Dr.

9  Conibear's conclusion, in turn, was plainly unsupported by substantial evidence in the record for

10  two reasons.  First, despite the fact that Plaintiff's initial approval for LTD benefits was based on Dr.

11  Greenhood's conclusion that Plaintiff suffered from Chronic Fatigue Syndrome (and not due to her

12  HIV or depression), IDSC's request for a paper review informed Dr. Conibear that Plaintiff was

13  disabled due to her depression and HIV.  Consequently, Dr. Conibear's report did not address the

14  question of whether Plaintiff continued to be disabled due to her Chronic Fatigue Syndrome.

15  Rather, she focused on the fact that Plaintiff's "HIV [was] in good control such that she [was] trying

16  to conceive with the support of her treating physicians."

17           Second, Dr. Conibear's conclusion that Plaintiff could perform sedentary work was based, in

18  large part, on the notes from Dr. Garcia stating that Plaintiff was working full time and had been

19  working full-time since at least November 2008.  In fact, it is undisputed that Plaintiff was not

20  working at all during this period of time and that this statement was merely the result of a clerical

21  error.  Clearly, had it been true that Plaintiff was working full-time in her previous position, this

22  would have provided strong evidence that Plaintiff was no longer disabled.  Because it was not true,

23  however, and Dr. Conibear had not addressed Plaintiff's Chronic Fatigue Syndrome, her conclusion

24  that Plaintiff could perform sedentary work plainly was not supported by substantial evidence. By

25  extension, IDSC's reliance on the Transferrable Skills Assessment – the starting point of which was

26  the assumption that Plaintiff could perform sedentary work – was unreasonable.

27

28

United States District Court

For the Northern District of California

d. **The Plan's Reliance on Physician Reviews by Doctors Polsky, Sonne and Maslow was Unreasonable**

In support of its termination of Plaintiff's benefits, IDSC also relied on the opinions of Drs. Polsky, Maslow and Sonne.  IDSC's reliance on these reviews was unreasonable, however, for several reasons.

First,  Dr. Polsky, expressly limited his conclusions to Plaintiff's psychiatric symptoms.  As Plaintiff was originally found to be disabled due to her Chronic Fatigue Syndrome and not on the basis of any psychiatric diagnosis, his opinions do not offer substantial evidence in support of the Plan's determination that Plaintiff was no longer disabled.

Second, Dr. Maslow's opinion also does not provide substantial evidence in support of IDSC's conclusion that Plaintiff's Chronic Fatigue Syndrome was no longer disabling.  Dr. Maslow concluded that Plaintiff did not suffer from CFS at all because Plaintiff did not "meet other criteria for CFS to include sore throats . . .and lymphadenopathy."  Dr. Maslow's conclusion is contradicted by the medical record, however.  In particular, Dr. Garcia's records document numerous symptoms in addition to fatigue that meet the CDC diagnosis guidelines, including low-grade fevers, muscle aches and swollen glands.

Third, Dr. Sonne's opinion does not support the Plan's conclusion that Plaintiff was no longer disabled because of her Chronic Fatigue Syndrome.  Dr. Sonne did not address Plaintiff's Chronic Fatigue Syndrome but implicitly rejected the diagnosis when he concluded that Plaintiff suffered from "some fatigue, perhaps from HIV."  That conclusion is contradicted by Dr. Stack's medical reports from 2009, in which he repeatedly found that Plaintiff was doing extremely well from an "immunological and virological perspective."  Nor is there any other medical evidence that supports Dr. Maslow's speculation that Plaintiff's fatigue was the result of her HIV.  Dr. Sonne's finding that Plaintiff was not disabled was further flawed to the extent that he relied on the Transferrable Skills Assessment to conclude that Plaintiff had an "excellent work capacity."  As discussed above, the underlying premise of the Transferrable Skills Assessment, that Plaintiff could perform sedentary work, was based on incorrect information about Plaintiff's employment status.

1    Therefore, for this reason as well, Dr. Sonne's opinion did not offer a reasonable basis for the Plan's

2    finding that Plaintiff was no longer disabled.

3         The Plan now attempts to avoid this clear error by arguing that the Claims Administrator

4    "did not reject Plaintiff's claim because it disputed that she suffered from chronic fatigue syndrome"

5    but rather "Plaintiff's claim was denied because the Claims Administrator disputed the impact of

6    Plaintiff's alleged chronic fatigue syndrome on her ability to work."  The Court finds that the Plan

7    has mischaracterized the administrative record, which plainly reflects that the Plan relied heavily on

8    the opinions of Doctors Maslow and Sonne, both of whom rejected the diagnosis (whether implicitly

9    or explicitly) altogether.

10        d.        **The Plan's Reliance on Plaintiff's Travel Plans and Foster Children was**
11                  **Unreasonable**

12        Finally the Court addresses Defendant's assertion that it's termination of benefits was

13   reasonable because, even if Plaintiff continued to suffer from Chronic Fatigue Syndrome, her

14   symptoms were no longer severe enough to warrant a finding of total disability.  Defendant points

15   out that under ERISA, a Plan is not required to give special deference to a physician's doctor's

16   opinion and that the opinions of Dr. Garcia and Ms. Giordano were "mere unsupported conclusions

17   based on Plaintiff's own complaints of fatigue, muscle soreness, depression, memory loss, cognitive

18   deficits and anxiety."   Where a treating doctor has not provided a "clear evaluation of plaintiff's

19   functional level," the Plan argues, it is within the Plan's discretion to make a finding as to the

20   severity of a claimant's symptoms.  *Id*. at 15 (citing *Holifield v. UNUM Life Ins. Co. of Am.*, 640 F.

21   Supp.2d 1224, 1227-1228 (C.D. Cal. 2009).  Here, the Plan argues that its finding that Plaintiff's

22   symptoms were not severe enough to warrant a finding of total disability was reasonable because

23   "Plaintiff was capable of caring for three infant foster children, leading church groups, and engaging

24   in other activities, such as planning mission trips, and trips across the country to visit her family."

25        As a preliminary matter, this argument fails because this was *not* the primary reason offered

26   by the Plan for terminating Plaintiff's LTD benefits.  Further, even if it were the reason for the

27   denial, the Plan abused its discretion because there is no indication in the Administrative Record that

28   the Plan made any meaningful effort to obtain the evaluation of Plaintiff's functional level that the

United States District Court

For the Northern District of California

1   Plan now asserts was lacking.  In particular, even though the reports from Dr. Garcia indicate that he

2   was aware of Plaintiff's efforts to adopt or conceive as well as her travel plans, the Plan never asked

3   him to provide a functional assessment that would have allowed it to evaluate the severity of

4   Plaintiff's symptoms in light of these activities and plans.  The Ninth Circuit has held that "where

5   the denials were based on absence of some sort of medical evidence or explanation, the

6   administrator is obligated to say in plain language what additional evidence it needed and what

7   questions it needed answered in time so that the additional material could be provided."  *Salomaa*,

8   642 F.3d at 680.   The Plan did not meet this requirement.

9   **VI.     CONCLUSION**

10          Based on all of the considerations discussed above, the Court concludes that the Plan abused

11   its discretion when it terminated Plaintiff's LTD benefits.  Therefore, the Court remands for an

12   award of benefits retroactive to the effective date of termination.  *See Pannebecker v. Liberty Life*

13   *Assur. Co. of Boston*, 542 F.3d 1213, 1221 (9th Cir. 2008) (explaining that "[w]here an

14   administrator's initial denial of benefits is premised on a failure to apply plan provisions properly,

15   we remand to the administrator to apply the terms correctly in the first instance . . . [b]ut if an

16   administrator *terminates* continuing benefits as a result of arbitrary and capricious conduct, the

17   claimant should continue receiving benefits until the administrator properly applies the plan's

18   provisions").   The parties shall meet and confer to address the amount of back benefits, reasonable

19   attorneys' fees and costs should be awarded.  If the parties are unable to reach agreement on these

20   issues, within 21 days of the date of this order Plaintiff shall bring a motion setting forth any issues

21   that remain to be resolved by the Court.

22          IT IS SO ORDERED.

23

24   Date: November 23, 2011

25

26

27   _____

28   JOSEPH C. SPERO
     United States Magistrate Judge